SCOTT LAKE
NV Bar No. 15765
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 6205
Reno, NV 89513
Phone: (802) 299-7495
Email: slake@biologicaldiversity.org

ROGER FLYNN
CO Bar No. 21078
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
Phone: (303) 823-5738
Email: roger@wmaplaw.org
(*pro hac vice application to be submitted*)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and AMARGOSA CONSERVANCY,<br><br>        Plaintiffs,<br><br>vs.<br><br>DEBRA HAALAND in her official capacity as Secretary of the Interior, TRACY STONE-MANNING in her official capacity as the Director of the Bureau of Land Management, U.S DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and NICHOLAS B. PAY in his official capacity as Field Manager of the Bureau of Land Management Pahrump Field Office,<br><br>        Defendants. | Case No: 2:23-cv-1049<br><br><br>**COMPLAINT FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiffs Center for Biological Diversity (the Center), and Amargosa Conservancy (the Conservancy) (collectively Plaintiffs) challenge the decisions of Defendants Debra Haaland, Tracy Stone-Manning, U.S. Department of the Interior (Interior), Bureau of Land Management (BLM), and Nicholas B. Pay (collectively Defendants) authorizing and allowing the Let's Go Lithium mineral exploration project (the Project) on federal lands in central Nevada. The Project is located in BLM's Pahrump Planning Area, within Nye County, adjacent to Ash Meadows

National Wildlife Refuge (the Refuge), with activities taking place within and around the Ash Meadows Area of Critical Environmental Concern (ACEC) and the Amargosa Mesquite ACEC. BLM's decision allowing the Project to go forward fails to adequately protect these ecologically critical areas and in doing so violates the Federal Land Policy and Management Act (FLPMA), §§ 1701 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, as well as the implementing regulations of these laws, including BLM's regulations governing mineral exploration on federal public lands.

2.     BLM's actions in this case threaten one of the most unique and biologically diverse areas in the United States, and possibly the world. The Refuge is a place of unparalleled beauty and natural wonder, where spring-fed wetlands draw a stark contrast to the surrounding desert shrublands and woodlands. Because of its isolation within the vast Mojave Desert, the Refuge harbors one of the most remarkable assemblages of rare and endemic species in the world, including a dozen species protected as "threatened" or "endangered" under the Endangered Species Act (ESA). The rare and endemic species at the Refuge, and the ecosystem that sustains them, depend entirely on springflows that originate in the groundwater aquifer. As such, any disturbance to this aquifer has long been recognized as a threat to Ash Meadows and the species that live there.

3.     In addition to providing an irreplaceable refuge for the area's biodiversity, Ash Meadows is an integral component of the human community in the Amargosa Basin, and is highly valued by the area's inhabitants, including the Timbisha Shoshone Tribe—who have lived in the area from time immemorial—and residents of the nearby towns of Beatty, Nevada, Amargosa Valley, Nevada, and Shoshone, California.

4.     The Project involves drilling up to 30 boreholes in close proximity to Ash Meadows and multiple groundwater-fed springs known to harbor threatened and endangered species. According to the Project proponent, Rover Metals (USA), Inc., (Rover), all boreholes will encounter the groundwater aquifer. Despite the risk to the species and ecosystems of Ash Meadows

posed by this exploratory drilling, BLM failed to take actions necessary to prevent unnecessary and undue degradation of the Refuge and surrounding public lands. BLM also applied its regulations in an arbitrary, capricious, and unlawful manner, thereby failing to ensure the robust environmental review and public participation that FLPMA and BLM's own regulations require in these circumstances. Because of BLM's actions, the area's residents, including Plaintiffs' members, have been provided no notice and no opportunity to weigh in on actions that will likely permanently and irreparably alter this unique and treasured landscape.

5.    In addition to violating FLPMA, NEPA, and its own regulations governing public-lands mining exploration, BLM has failed to comply with the ESA, which requires BLM to consult with the U.S. Fish and Wildlife Service (FWS) to "insure that any action" it "authorize[s], fund[s], or carrie[s] . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of that species' designated critical habitat. 16 U.S.C. §1536(a)(2). Mineral operations on public lands, regardless of whether they are properly considered "notice" or "plan" operations, are subject to this consultation requirement. *See Karuk Tribe of Cal. v. United States Forest Serv.*, 681 F.3d 1006, 1030 (9th Cir. 2012) (*en banc*). Because the proposed drilling operations will intersect groundwater aquifers in locations adjacent to the Refuge, they may affect groundwater-dependent threatened and endangered species, and their designated critical habitat, within the Refuge. BLM did not consult with FWS before allowing the proposed exploration activities, and thus violated the ESA.

6.    On May 26, 2023, Plaintiffs sent Defendants 60-day notice of intent to sue pursuant to ESA Section 11(g)(2)(A), 16 U.S.C. § 1540(g)(2)(A). Under that provision, Plaintiffs may not sue for declaratory and injunctive relief "prior to sixty days after written notice of the violation has been given to the Secretary [of the Interior], and to any alleged violator of any such provision or regulation." The Secretary, BLM, and other Defendants received Plaintiffs' notice electronically on May 26, 2023. Accordingly, the 60-day notice period runs on July 25, 2025. Plaintiffs intend to amend this Complaint on or after that date, pursuant to Fed. R. Civ. P. 15(a)(1), to seek vacatur, declaratory relief, and injunctive relief for BLM's violations of the ESA. Anticipating Plaintiffs'

future amendment as-of-right, the following contains background legal and factual information on the consultation requirements of the ESA and BLM's violations thereof.

## FACTUAL BACKGROUND

**Ash Meadows National Wildlife Refuge**

7.    Ash Meadows National Wildlife Refuge consists of over 24,000 acres of Mojave Desert wetland and upland habitat in southeastern Nye County, Nevada, near the town of Amargosa Valley. It is managed by FWS for the conservation and recovery of the numerous threatened, endangered, and sensitive plant and animal species that live there.

8.    Ash Meadows is essentially a watered island amidst the expansive Mojave Desert. Groundwater-fed springs within the Refuge support the existence of relict plants and animals which originally migrated into the region during wetter climactic periods. Because Ash Meadows has been isolated by miles of arid desert, many of the plants and animals there have evolved into distinct species, and are currently found nowhere else on Earth. Ash Meadows is also one of the last remaining oases in the Mojave Desert that is frequented by a wide diversity of neotropical and migratory birds.

9.    The Refuge was established on June 18, 1984, from a combination of private land acquired from The Nature Conservancy and additional land transferred from the BLM to the FWS in order to protect and restore the endemic, endangered, and rare plants and animals found there.

10.    Ash Meadows is a biodiversity hotspot of global significance. In 1986, Ash Meadows became the fourth designated Ramsar Convention Wetland of International Importance in the United States, described by Ramsar as "an area exhibiting the greatest biological endemism in the USA."[1]

_____

[1] Ramsar sites are designated under the authority of the Convention on Wetlands, an intergovernmental treaty adopted in Ramsar, Iran in 1971. The Convention on Wetlands is the oldest of the modern global intergovernmental environmental agreements. Designated Wetlands of International Importance such as Ash Meadows "are recognized as being of significant value

11.     According to FWS: "The Refuge was created to conserve and protect the habitats and populations of endemic, resident, and migratory species. The Refuge is an area of exceptional biological diversity resulting from a unique combination of limited water resources and an isolated desert environment. At least twenty-five species of plants and animals are restricted to the local geographic area, one of the highest concentrations of endemic species found in the United States." U.S. Fish and Wildlife Service, *Ash Meadows National Wildlife Refuge, Water Resource Inventory and Assessment* (January 2014), at 7 (hereinafter, "*FWS 2014 Water Report*").

12.     The Refuge's springs and associated surface-water flows create diverse wetland habitats that support several endangered and threatened species, most of which, as noted, exist nowhere else on Earth, and all of which are fully dependent upon groundwater. The following species endemic or near-endemic to the Refuge are protected under the ESA:

    a.    Ash Meadows Amargosa pupfish (*Cyprinodon nevadensis mionectes*), endangered;

    b.    Ash Meadows speckled dace (*Rinichtys osculus nevadensis*), endangered;

    c.    Warm Springs pupfish (*Cyprinodon nevadensis pectoralis*), endangered;

    d.    Devil's Hole pupfish (*Cyprinodon diabolis*), endangered;

    e.    Ash Meadows blazing star (*Mentzelia leuciphylla*), threatened;

    f.    Amargosa niterwort (*Nitrophila Mohavensis*), endangered;

    g.    Ash Meadows milkvetch (*Astragulus phoenix*), threatened;

    h.    Ash Meadows sunray (*Enceliopsis nudicaulis corrugata*), threatened;

    i.    Ash Meadows gumplant (*Grindelia fraxinoperatensis*), threatened;

    j.    Ash Meadows ivesia (*Ivesia Kingii var. eremica*), threatened;

    k.    Spring-loving centaury (*Zeltnera namophila*), threatened;

    l.    Ash Meadows naucorid bug (*Ambysus amargosus*), threatened;

---

not only for the country or the countries in which they are located, but for humanity as a whole."
*See* https://www.ramsar.org/about-the-convention-on-wetlands-0.

13.     Within the boundaries of the Refuge is the Devil's Hole unit of Death Valley National Park, home of the endangered Devil's Hole pupfish, one of the world's rarest fishes, which lives only at that one location, in a waterhole near the Project site fed by the regional aquifer system.

14.     The Refuge has seven springs which historically have discharged at rates greater than 500 gallons per minute (1.1. cubic feet per second). There are an additional 25-50 springs discharging less than 500 gallons per minute. Combined, these springs discharge about 17,000 acre-feet per year of surface water and form one of the most ecologically significant areas of surface water in the Mojave Desert. *See FWS 2014 Water Report* at 5.

15.     "Almost all species at Ash Meadows are critically dependent on the water resources of the Refuge." *FWS 2014 Water Report* at 7.

16.     Three major springs on the north part of the Refuge and closest to the proposed drilling into groundwater—Fairbanks, Rogers, and Longstreet—are relatively cool compared with other springs in the refuge, suggesting they receive flow from the shallow groundwater aquifer from the north or northeast, within the Project area. *See FWS 2014 Water Report* at 22.

17.     Fairbanks Spring is a spring in the northernmost portion of the Refuge, closest to the Project's drilling into the groundwater, which contributes substantial surface flow to the overall Ash Meadows flow system. Fairbanks Spring is home to, and crucial habitat for, the endangered Ash Meadows Amargosa pupfish. 46 Fed. Reg. 40178-86. It has also been the site of intensive habitat restoration efforts by the FWS to restore and enhance the populations of this rare endemic species.

18.     FWS has designated critical habitat for all of the threatened and endangered species at the Refuge (except the Warm Springs pupfish) encompassing all of the areas where the species are found. 46 Fed. Reg. 40178-86; 50 Fed. Reg. 20777-94. Designated critical habitat thus includes the Refuge springs and their associated surface flows. *See id.*

**The "Let's Go Lithium" Project**

19.     Rover is a Canadian mining company with an office in Reno, Nevada that is proposing development of a hardrock lithium open-pit mining operation on federal public lands in Amargosa Valley in Southern Nevada adjacent to the Refuge, the Ash Meadows ACEC, and the Amargosa Mesquite ACEC. This project is known as the Let's Go Lithium Project.

20.     As a precursor to actual mining, on January 20, 2023, Rover filed a Notice of Intent (NOI) pursuant to 43 C.F.R. § 3809.21 to conduct mineral exploration drilling in the Ash Meadows area. Rover's intent, as stated in the NOI, was to "test alluvium and bedrock for lithium content."

21.     After discussions with BLM, Rover submitted a revised NOI on March 22, 2023.

22.     As shown on the map below, Rover's March 22 NOI, as approved by BLM, includes up to 30 drilling sites. The Project area is adjacent to the Refuge and drilling is proposed



**Figure 1: Map of Ash Meadows and the Let's Go Lithium Project**

within 2,000 feet of Fairbanks Spring. The NOI acknowledges that "[a]ll drill holes will be expected to intersect ground water." NOI at 4; *see also id.* at 6  ("[G]roundwater is expected to be encountered in each drill hole."). The "drill holes [are] planned to [be] 250 to 300 feet deep each." *Id.* at 4. According to the NOI, boreholes from exploratory drilling will be "plugged according to State of Nevada requirements," *id.* at 8, but the NOI contains no specific information on whether or how Rover intends to avoid, minimize, or mitigate any impacts caused by puncturing the groundwater aquifer.

23.    To dispose of the waste generated by the drilling operations, the Project will involve the excavation of open-air pits, called sumps, for each of the 30 proposed boreholes. *See id.* at 4. The NOI does not include any mitigation measures to control the waste from the drilling, such as lining the sumps to prevent groundwater contamination. Nor does the NOI explain what drilling chemicals or compounds will be used.

24.    On April 5, 2023, the BLM accepted Rover's modified NOI and ordered the company to pay a minimal bond of $30,003.00. On May 18, 2023, in response to an inquiry from the Center, BLM stated: "Rover has not submitted the bond and therefor [sic] they are not currently authorized to begin work."

25.    On June 29, 2023 the nearby Town of Beatty, Nevada sent BLM a letter formally registering its opposition to the Project—and specifically to BLM's hasty approval of Rover's NOI—due to the likelihood of irreversible impacts to the water resources of the area. The Town's letter stated: "Allowing Rover Metals, or any company to conduct this type of potentially destructive, water intensive and invasive[] activity so close to a declared refuge and ACEC seems to contradict the goal of sustaining the health and diversity of our public lands for the use and enjoyment of present and future generations of all species." Letter from Erika Gerling, Beatty Town Advisory Board Chair, to Nicholas B. Pay, BLM Field Manager, Pahrump Field Office (June 29, 2023), at 1.

26.    The Town further requested that BLM "initiat[e] formal consultation with the U.S. Fish and Wildlife Service regarding the potential impacts of the project, requir[e] a Plan of

Operations from Rover Metals for the project, and conduct[] an environmental review of the Plan of Operations in accordance with NEPA to include an Environmental Assessment or an Environmental Impact Statement as appropriate." *Id.* at 2. The Town specifically asked that BLM "halt this exploration project until the proper environmental, hydrological, and other applicable studies can be completed." *Id.*

27.    On June 30, 2023, in response to an inquiry from the Center, BLM stated: "Rover Metals is actively working with the Nevada State Office to get their Financial Guarantee in place in accordance with the regulations found in 43 CFR 3809. Once that financial guarantee has been adjudicated by the team at the State Office they will send out an acceptance letter to the operator. Once the financial guarantee has been accepted then the operator is able to carry out the work identified in their notice consistent with the Mining Law of 1872 (30 U.S.C. 22 et seq.) and the implementing regulations found in 43 CFR 3809."

28.    Rover has stated publicly that it will "start drilling in mid-July."[2] On information and belief, Rover intends to start drilling on July 17, 2023.

29.    The Project directly threatens the springs, fish, terrestrial wildlife, plants, and ecosystems of the Refuge, the Ash Meadows ACEC, and the Amargosa Mesquite ACEC.

30.    Rover's NOI does not describe how the company will "prevent unnecessary and undue degradation" to public lands and resources resources—including the springs, fish, wildlife and habitats that depend upon these waters—from impacts to groundwater hydrology and/or springflows, as required by FLPMA. 43 U.S.C. §1732(b).

31.    BLM has not consulted with FWS pursuant to Section 7(a)(2) of the ESA to ensure that the proposed drilling operations do not jeopardize the continued existence of any threatened or endangered species or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2).

---

[2]    https://stockhouse.com/news/the-market-herald-news/2023/06/27/rover-metals-ready-to-drill.

32.     On information and belief, BLM did not contact FWS, or otherwise inform FWS of the project and its potential impacts, before allowing the Project to go forward.

**Potential Impacts to the Refuge and Federally Listed Threatened and Endangered Species**

33.     FWS, which administers the Refuge, has recognized that protecting the groundwater aquifer in the Amargosa Basin is critical to conserving the many threatened, endangered, and endemic species at Ash Meadows. According to FWS, "[a]ctivities that may cause adverse [e]ffects [to listed species] include those that alter spring discharge quantities and routes, stable soil conditions (including drainage patterns from surrounding topography), and native vegetation." Don W. Sada, U.S. Fish and Wildlife Service, *Recovery Plan for the Threatened and Endangered Species of Ash Meadows, Nevada* (Sept. 28, 1990), at 27.

34.     Similarly, "[s]ubstantial evidence" collected by the U.S. Geological Survey "shows that spring discharge [in the Refuge] is intimately related to the viability of the . . . aquifer." *Id.* at 38-39.

35.     Changes in groundwater flow and elevation—including changes in shallow subsurface water and the basin-fill aquifer—could affect the flow, temperature, and chemical content of springs to which endemic species in the Refuge are adapted. U.S. Fish and Wildlife Service, *Five-Year Review and Evaluation for the Ash Meadows Amargosa Pupfish (*Cyprinodon nevadensis mionectes*)* (March 17, 2010), at 15. All of the threatened and endangered species within the Refuge depend on spring systems arising from a regional groundwater flow system called the "carbonate aquifer," as well as its nexus with the basin fill and other local subsurface water. *See id.* Disruptions to the surface and subsurface hydrology are recognized as particularly acute threats to groundwater dependent species such as the Ash Meadows Amargosa pupfish. *Id.*

36.     Mining and mining exploration are well-recognized threats to the threatened and endangered species at Ash Meadows. *See id.* at 17-18. According to FWS, "[n]ew mineral claims and subsequent mining could cause direct loss of . . . fish habitat, as well as indirect impacts by diverting or draining water away from occupied habitat." *Id.* Because if their potential impacts, mineral operations are incompatible with the Refuge's purposes. *Id.* at 18.

37.     As acknowledged by Rover, drilling within the Project area will intersect groundwater that is in hydrologic communication with the Refuge springs. Rover NOI at 6. Accordingly, it is likely that drilling will impact the groundwater aquifer that supplies water at these springs and harm the threatened and endangered animals and plants in the Refuge that depend on springflow. At least two wells drilled within the Project area—one by the U.S. Geological Survey and one by the U.S. Department of Energy—have produced artesian flow, meaning they encountered pressurized groundwater. Neither BLM nor Rover have proposed or analyzed measures to contain artesian flows and pressures.

38.     Although the exact hydrogeology of the Project area is not fully known, Rover's proposed drilling presents a likelihood of irreparable harm to groundwater-dependent species and ecosystems in the Refuge, as demonstrated by the historical case of "the Borehole" or "Borehole Spring." The site on the Amargosa River south of Ash Meadows in Tecopa, California, now known as "the Borehole" or "Borehole Spring," was created by mineral exploration drilling in the 1960s that encountered artesian flow at a depth of 360 feet. Attempts to plug the Borehole failed and the resulting artesian flow continues to the present day. Creation of the Borehole depressurized the surrounding aquifer, lowering groundwater levels, decreasing spring discharge, and causing at least one nearby spring to dry up completely. Hydrologic impacts from the creation of the Borehole have been observed several miles away from the site itself.

39.     The Project will also disturb previously undisturbed upland habitats with heavy equipment, drilling rigs, and the creation of new access routes. Affected habitats include creosote shrublands and mesquite woodlands, which will be disturbed, de-vegetated, and irreparably damaged by Rover's proposed activities. These areas provide important wildlife habitat and are contiguous with protected habitats within the Amargosa Mesquite ACEC, the Ash Meadows ACEC, and the Refuge.

40.     To access its drilling sites with vehicles and heavy equipment, Rover will utilize access routes that run through the Ash Meadows ACEC and/or the Amargosa Mesquite ACEC.

Rover will also utilize access routes through the Ash Meadows ACEC to provide water for drilling operations.

41. Despite the potential impacts to threatened and endangered species and sensitive wildlife habitats, and despite the fact that Rover's NOI contains no information on whether or how Rover intends to avoid, minimize, or mitigate any direct, indirect, or cumulative impacts from its proposed drilling operations—especially to the area's unique and invaluable groundwater resources and springs—BLM accepted Rover's notice and did not require the company to submit a Plan of Operations or conduct the appropriate level of NEPA and FLPMA analysis as required by its own regulations at  43 C.F.R. §§ 3809.11 and 3809.411, and NEPA at 42 U.S.C. § 4332.

## JURISDICTION AND VENUE

42. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), and 5 U.S.C. §§ 551-706 (Administrative Procedure Act), because this action involves the United States as a defendant and arises under the laws of the United States, including FLPMA, 43 U.S.C. §§ 1701 *et seq.*, NEPA, 42 U.S.C. § 4331 *et seq.*, and the APA, 5 U.S.C. §§ 551-706. An actual justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act) and 5 U.S.C. §§ 705 and 706 (Administrative Procedure Act). The challenged agency actions are final and subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706 (APA).

43. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants have offices in this judicial district, a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this judicial district, and the lands involved in this case are located in this judicial district.

44. Venue is proper in the Southern Division of this District, as the challenge involves federal lands and resources in Nye County. L.R. 1A 1-6.

**PARTIES**

45.    The Center is a tax-exempt, non-profit, membership organization with 84,324 members, including 666 members in Nevada. The Center's main office is in Tucson, Arizona. The Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. The Center has an extensive history of working to protect Nevada's ecosystems, species, water, and climate from groundwater over-appropriation.

46.    The Center's members' diverse interests span natural history, ecology, conservation, wildlife and native plant observation, nature photography, hiking, camping, backpacking, quiet and solitude in nature, dark skies, spiritual renewal, and a love of the Great Basin's natural landscapes. Center members derive benefit from engaging with landscapes and the endangered species that reside there. The Center's members expect and rely upon federal and state regulatory agencies, such as BLM, to protect the species, habitats, viewsheds, and air and water quality of these lands.

47.    The Amargosa Conservancy is a 501(c)(3) not-for-profit organization based in Shoshone, California. It was incorporated in 2004. The Conservancy's mission is to work toward a sustainable future for the Amargosa Basin through science, stewardship and advocacy. The Conservancy is managed by a Board of Directors composed of 10 individuals from California and Nevada with passion and expertise related to the natural and cultural resources and human communities of the Amargosa Basin. The Conservancy has been the leading voice for conservation in the Amargosa Basin for almost twenty years. The Conservancy's accomplishments include: successfully advocating for the designation of the Amargosa Wild and Scenic River in 2009, and the expansion of same in 2019; building a new trailhead for the Amargosa River Trail at China Ranch in Tecopa; partnering with numerous organizations to create habitat for the endangered Amargosa vole in Shoshone; and facilitating a long-term hydrological monitoring program which has proven vital to understanding the complex hydrology of the region.

48.    The Conservancy has 563 paying members and 1,702 supporters. The Conservancy's members' diverse interests span natural history, ecology, conservation, wildlife

and native plant observation, nature photography, hiking, camping, soaking in hot springs, quiet and solitude in nature, and spiritual renewal—all centered on the public lands of the Amargosa Basin, including Ash Meadows and the Project area. The Conservancy's members expect and rely upon federal and state regulatory agencies, such as BLM, to protect the species, habitats, viewsheds, and air and water quality of these lands.

49.     Plaintiffs bring this action on their own behalf, and on behalf of their members. Plaintiffs and/or their members regularly use and enjoy the federal public lands managed by the BLM within the Pahrump Planning Area, including the lands within the Refuge and lands near and within the Project Area.

50.     Center member and Great Basin Director Patrick Donnelly has lived in the Amargosa Basin for nine years. Mr. Donnelly currently lives in Shoshone, California, roughly 40 miles from the Refuge. He regularly recreates and seeks spiritual renewal on public lands and federally protected areas in Nevada, including at Ash Meadows and in uplands within the Project Area. Mr. Donnelly has a particular interest in rare and endemic desert species, including the threatened and endangered species found within and around the Refuge. He has visited the Refuge more times than he can count, most recently on June 25, 2023. He often stops by Fairbanks Spring on these visits to view wildlife (including the endangered Ash Meadows Amargosa pupfish), take photographs, and seek solitude and spiritual renewal amidst the desert landscape.

51.     Conservancy members, including Executive Director Mason Voehl, derive benefit from engaging with the landscapes of the Amargosa Basin and the many wildlife species that reside there, including threatened and endangered species. Mr. Voehl is an environmental writer, hiker, and photographer who has spent considerable time drawing inspiration from public lands in Nevada, particularly in the Death Valley ecoregion that includes Ash Meadows. Mr. Voehl regularly visits Ash Meadows, most recently it June 29, 2023—a visit which included Fairbanks Spring. Mr. Voehl enjoys observing the endangered species at Fairbanks Spring and elsewhere in the Refuge, including the Ash Meadows Amargosa pupfish, and drawing inspiration from the spectacular desert landscape that includes the Project area.

52.     Both Mr. Donnelly and Mr. Voehl plan to visit Ash Meadows and Fairbanks Spring, as well as the Project area, regularly into the foreseeable future, including during the Summer of 2023, to enjoy these areas and pursue their interests.

53.     By authorizing the Project, Defendants approved actions that will significantly and irreparably harm Plaintiffs' interest in Ash Meadows and the specific Project area. The legal violations alleged in this Complaint cause direct injury to Plaintiffs' health, recreational, inspirational, religious, scientific, educational, and aesthetic interests. Plaintiffs and their members have been and will continue to be adversely affected and irreparably harmed if Defendants' ongoing violations of the ESA, FLPMA, NEPA, and the APA continue. These are actual, concrete injuries caused by the BLM's violations of the ESA, FLPMA, NEPA, and the APA. Plaintiffs and their members' injuries will be redressed by the relief sought.

54.     Defendants' failure to comply with NEPA and FLPMA additionally harms Plaintiffs and their members by denying them the right to informed decisionmaking and full disclosure under NEPA and FLPMA, as well as the right to meaningfully participate in the decisionmaking process.

55.     Interior is a cabinet-level executive agency responsible for, among other things, managing federally-owned lands, wildlife, and public natural resources throughout the United States. Interior has the ultimate responsibility to administer and implement FLPMA, and to comply with all other applicable federal laws, including NEPA.

56.     Defendant Debra Haaland, U.S. Secretary of the Interior, is the highest-ranking official within Interior, and in that capacity has ultimate responsibility for the administration of federal public lands and implementation of the statutes applicable thereto, including FLPMA and NEPA. Secretary Haaland is sued in her official capacity.

57.     BLM is an agency within the U.S. Department of the Interior. BLM and its officers are responsible for administering federally-owned public lands and natural resources, under all federal laws applicable thereto, including NEPA and FLPMA.

58.     Defendant Tracy Stone-Manning is the Director of BLM and as such is the highest-ranking official within the agency. Director Stone-Manning is sued in her official capacity.

59.     Defendant Nicholas B. Pay is the Field Office Manager for BLM's Pahrump Field Office. As Field Office Manager, Mr. Pay is responsible for administering and managing public lands and resources within the Pahrump Planning Area, including lands and resources located within and around the Project area. Mr. Pay accepted Rover's NOI, which allowed the company to commence mineral exploration activities. He is sued in his official capacity.

<strong>LEGAL BACKGROUND</strong>

**The Federal Land Policy and Management Act of 1976 (FLPMA)**

60.     FLPMA is the "organic act" of BLM and governs the agency's management of public lands and resources. In FLPMA, Congress declared that is the policy of the United States to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and that, "where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(a)(8).

61.     FLPMA requires that BLM, in managing the public lands, "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation [UUD] of the lands." 43 U.S.C. § 1732(b). This is known as the "prevent UUD" standard.

62.     BLM has promulgated regulations intended to prevent UUD by operations authorized by the mining laws. *See* 43 C.F.R. § 3809.1(a).

63.     For regulatory purposes, BLM divided mineral operations into three categories according to the size and location of the operations. 43 C.F.R. § 3809.10.

64.     Mineral exploration operations that will result in only negligible disturbance of federal lands, and do not involve the use of mechanized earth-moving equipment, truck-mounted drilling equipment, or explosives, are identified as "casual" use operations. 43 C.F.R. § 3809.5.

65.     "Notice" mineral exploration operations are those that will cause a cumulative surface disturbance of five acres or less, 43 C.F.R. § 3809.21, and do not take place in certain

"special status areas" where Section 3809.21 does not apply, including ACECs and "lands or waters known to contain Federally proposed or listed threatened or endangered species or their proposed or designated critical habitat." 43 C.F.R. § 3809.11.

66.    Prior to commencing "notice" mineral exploration operations, the operator must provide an NOI the BLM that describes the proposed activities. 43 C.F.R. § 3809.301. Additionally, the NOI must provide that reclamation of disturbed areas will be completed, and that measures will be taken to prevent UUD of the lands during operations. *Id.*

67.    After BLM has received an NOI for a mineral exploration operation, the agency reviews the NOI to see if it is complete. 43 C.F.R. § 3809.311(a). If the NOI is incomplete, BLM will inform the operator in writing of the additional information that it must submit to BLM. 43 C.F.R. § 3809.311(b). If the operator does not demonstrate that it will prevent UUD, BLM cannot approve or allow the operations. 43 C.F.R. § 3809.311(c).

68.    For mining or mineral exploration operations that will cause a cumulative surface disturbance of more than five acres, and for operations proposed in specifically designated "special status areas," the operator must provide a "Plan of Operations," that must be approved by BLM. 43 C.F.R. § 3809.11. Prior to approving the Plan of Operations, BLM must prepare an Environmental Assessment or Environmental Impact Statement pursuant to NEPA. 43 C.F.R. § 3809.411; BLM Handbook H-3809-1, § 4.4.1.3.2 (NEPA Analysis); 42 U.S.C. § 4332(C).

69.    Both "notice" and "plan" operations must prevent UUD by adhering to BLM's regulatory performance standards at 43 C.F.R. § 3809.420. *See* 43 C.F.R. § 3809.415. Specifically, BLM and mining operators must, among other things, "take such action as may be needed to prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations," 43 C.F.R. § 3809.420(b)(7), and "conduct all operations in a manner that complies with all pertinent Federal and state laws," including NEPA and the ESA, 43 C.F.R. § 3809.420(a)(6).

70.    According to BLM policy, "[m]itigation measures fall squarely within the actions [BLM] can direct to prevent unnecessary or undue degradation of the public lands. An impact that

can be mitigated, but is not, is clearly unnecessary." 65 Fed. Reg. 69998, 70052 (Nov. 21, 2000) (preamble to rule section that remains in force); *see also* M-37039, The Bureau of Land Management's Authority to Address Impacts of its Land Use Authorizations through Mitigation, 19-20 (Dec. 21, 2016). [3]

71.     In detailing part of BLM's duty to prevent UUD under FLPMA, the Interior Solicitor recently reaffirmed that:

> [I]t is well established that the UUD provision under FLPMA provides another basis for requiring mitigation in those circumstances where impacts in the absence of mitigation would be unnecessary or undue. Although mitigation may contribute in some instances to the avoidance of UUD, in other cases, the impacts to resources may be of a nature or magnitude such that they cannot be mitigated sufficiently to prevent UUD. **For example, the destruction of unique habitat in a particular place might not be adequately compensated by post-use restoration or protection of lesser habitat elsewhere. In such a case, where mitigation cannot prevent UUD, the BLM has authority to reject the application for approval of the public land use based on the proponent's inability to prevent UUD.** The obligation to avoid UUD is a complementary but distinct source of authority for requiring mitigation under FLPMA.

M-37039 (reinstated by M-37075) (April 15, 2022) (emphasis added).

**The National Environmental Policy Act (NEPA)**

72.     NEPA is "basic national charter for protection of the environment." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020). In passing NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment" and set out "to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a).

73.     NEPA serves twin goals. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). First, it aims to ensure that federal agencies carefully consider detailed

---

[3] M-37039 was temporarily revoked in 2017, but was recently reinstated by the Solicitor. M-37075, Withdrawal of M-37046 and Reinstatement of M-37039 (April 15, 2022). This new Opinion noted that the 2017 Opinion (M-37046) "expresses no views regarding the merits of the legal analysis or conclusions contained in the [2016 Opinion]." M-37075 at 2.

information regarding the environmental impact of a proposed action before reaching a decision on the action. *Id.* Second, it ensures that information about a proposal's environmental impact is made available to members of the public so that they may play a role in the decision-making process. *Id.* NEPA ensures that important effects will not be overlooked or underestimated, only to be discovered after resources have been committed or the die is otherwise already cast. *Id.*

74.    NEPA and its implementing regulations require federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3. An agency may first prepare an environmental assessment (EA) to determine whether an EIS is necessary. 40 C.F.R. § 1501.5. If, after preparing an EA, the agency decides that an EIS is not necessary, the agency must prepare an explanatory finding of no significant impact (FONSI) which "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment." 40 C.F.R. § 1508.1.

75.    In considering whether the effects of a proposed action are significant, agencies "should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act." 40 C.F.R. § 1501.3.

76.    Whether the agency prepares an EA or an EIS, the agency must take a "hard look" at all direct, indirect, and cumulative environmental impacts of the proposed action and reasonable alternatives thereto. *Kern v. United States BLM*, 284 F.3d 1062, 1071 (9th Cir. 2002). To fulfill its purpose, the agency's environmental analysis must "provide full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

**The Endangered Species Act (ESA)**

77.    The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It

reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id*. at 185. The statute's purpose is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b). Through the ESA, Congress declared its policy "that all Federal departments and agencies shall seek to conserve endangered and threatened species and shall utilize their authorities in furtherance of the purposes of [the act]." *Id.* § 1531(c)(1).

78.    The ESA defines "conserve" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3). Accordingly, the goal of the ESA is not only to temporarily save endangered and threatened species from extinction, but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of ESA protection.

79.    Pursuant to the ESA, a species is listed as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is listed as "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

80.    An important benefit the ESA conveys to listed species to prompt their recovery is the "designation" of protected "critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i). Areas designated as critical habitat are "essential" to the "conservation of the species." 16 U.S.C. § 1532(5)(A).

81.    The ESA requires federal agencies to consult with FWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of that species' designated critical habitat. 16 U.S.C. § 1536(a)(2). Thus, regardless of whether critical habitat has been designated, the action agency must consult with FWS regarding whether the action may "jeopardize the continued existence" of any listed species. *Id.* However, if critical habitat has been designated, the ESA imposes an additional consultation

requirement concerning whether the action may result in the "destruction or adverse modification" of the species' designated critical habitat. *Id.*

82.    To comply with ESA Section 7(a)(2), an action agency—BLM in the present case—generally must prepare a "biological assessment" (BA). 16 U.S.C. § 1536(c)(1). The BA process begins with a request from the action agency to FWS for information concerning whether any listed species or critical habitat is present in the project area. *See id.* After FWS provides this information, the action agency then determines, in the first instance, whether any listed species or critical habitat may be affected by the proposed action. *See id.* The BA then evaluates whether the species or critical habitat is likely to be adversely affected or not likely to be adversely affected by the proposed project. 50 C.F.R. § 402.12(a).

83.    If the proposed agency action may affect a listed species or critical habitat, the action agency must consult with FWS. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). If the agency action is likely to adversely affect a species or critical habitat, the action agency must engage in "formal consultation" with FWS. 50 C.F.R. § 402.14(a). On the other hand, if the action agency determines that its action is not likely to adversely affect a species or critical habitat it may engage in "informal consultation" with FWS. 50 C.F.R. §§ 402.13(a), 402.14(b)(1). If, as a result of informal consultation, FWS issues a written "concurrence" to the action agency that its proposed action is not likely to adversely affect a listed species or critical habitat, the consultation process ends. 50 C.F.R. §§ 402.13(a), 402.14(b)(1).

84.    To complete formal consultation, FWS must provide the action agency with a "biological opinion" (BiOp) explaining how the proposed action will affect the listed species or its critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. If FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species or result in the destruction or adverse modification of critical habitat, the BiOp must outline "reasonable and prudent alternatives," if any, that could be taken by the action agency without inflicting these harms. 16 U.S.C. § 1536(b)(3)(A). An action agency may not proceed with an action that would likely

jeopardize a listed species or destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2).

85.    If the BiOp concludes that the action is not likely to jeopardize the continued existence of a listed species, and is not likely to result in the destruction or adverse modification of critical habitat, FWS must address whether the action will nevertheless "take" members of the species. 16 U.S.C. § 1536(b)(4). "Take" in this context "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" under this definition "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. Specifically, FWS must provide the action agency with an "incidental take statement," specifying the amount or extent of incidental taking of such listed species that would be inflicted by the action and any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" with which the action agency must comply to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). To minimize the impacts of incidental take, the action agency must monitor and report the impact of its action on the listed species to FWS as specified in the incidental take statement. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(iv), 402.14(i)(3). If, during the course of the action, the amount or extent of incidental taking is exceeded, the action agency "must reinitiate consultation" with FWS "immediately." 50 C.F.R. § 402.14(i)(4).

**The Administrative Procedure Act (APA)**

86.    The APA provides for judicial review of federal agency actions for persons adversely affected or aggrieved by the agency action. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy are subject to judicial review. 5 U.S.C. § 704.

87.    The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and

conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706.

88.    An agency action is arbitrary and capricious if "the agency relied on factors which Congress did not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**FIRST CLAIM FOR RELIEF**

BLM Violated FLPMA and BLM Regulations at 43 C.F.R. Part 3809

Failure to Require a Plan of Operations

89.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

90.    BLM's mining regulations provide that certain operations do not qualify as "notice" operations even if they cause a cumulative surface disturbance of five acres or less. *See* 43 C.F.R. §§ 3809.11, 3809.21. These include operations "causing surface disturbance" or taking place in certain "special status areas" where Section 3809.21 does not apply, including "(3) Designated Areas of Critical Environmental Concern [ACECs]," and "(6) Any lands or waters known to contain Federally proposed or listed threatened or endangered species or their proposed or designated critical habitat." 43 C.F.R. § 3809.11(c)(3) and (6). Operations taking place in these "special status areas" require a Plan of Operations, which triggers the need for an Environmental Assessment or Environmental Impact Statement under NEPA. *Id.*; 43 C.F.R. § 3809.411; BLM Handbook H-3809-1, § 4.4.1.3.2 (NEPA Analysis); 42 U.S.C. § 4332(C).

91.    The project will cause surface disturbance to the Ash Meadows and Amargosa Mesquite ACECs. The drilling locations are adjacent to, or within the Ash Meadows ACEC. *See* Figure 1, *supra*. The Project's heavy equipment and vehicle access will be through, and disturb, the Ash Meadows ACEC and/or the Amargosa Mesquite ACEC. *See* Rover NOI at 2 (describing access via dirt roads from Highway 160 or State Route 373). The "Project Boundary" includes the

northern portion of the Amargosa Mesquite ACEC. *See* Rover Metals (USA), Inc., *Geology and Lithium Mineralization of the Let's Go Lithium Project* (Oct. 4, 2022), Fig. 3.

92.    The Project takes place on lands and waters known to harbor and sustain threatened and endangered species. Specifically, the Project is located in close proximity to the Refuge boundary and within 2,000 feet of Fairbanks Spring, which provides critical habitat for the endangered Ash Meadows Amargosa pupfish. Moreover, the Project involves drilling that will, per Rover's own admission, encounter the groundwater aquifer that supplies water to Fairbanks Spring and other springs within the Refuge. *See* Rover NOI at 4, 6.

93.    Rover's proposal does not qualify as a "notice" operation under BLM's regulations because it will take place within ACECs, and because it will occur within and/or impact lands and waters that contain threatened and endangered species. 43 C.F.R. §§ 3809.11, 3809.21.

94.    BLM accepted Rover's March 22, 2023 NOI without requiring the company to submit a Plan of Operations and without conducting the appropriate level of NEPA and FLPMA analysis. *See id.*; 43 C.F.R. § 3809.411; BLM Handbook H-3809-1, § 4.4.1.3.2 (NEPA Analysis); 42 U.S.C. § 4332(C).

95.    BLM's actions and omissions regarding the Project and Rover's March 22, 2023 NOI are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

96.    Alternatively, BLM's failure to require Rover to submit a Plan of Operations and its failure to conduct the appropriate level of NEPA and FLPMA analysis constitute agency action unlawfully withheld or unreasonably delayed within the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

**SECOND CLAIM FOR RELIEF**

BLM Violated FLPMA and BLM Regulations at 43 C.F.R. Part 3809

Failure to Prevent UUD

97.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

98.     Under FLPMA, BLM in managing public lands "shall . . . take any action necessary to prevent unnecessary or undue degradation [UUD] of the lands." 43 U.S.C. § 1732(b).

99.     Operations on public lands that do not adhere to BLM performance standards at 43 C.F.R. § 3809.420 fail to prevent UUD. 43 CFR § 3809.415. The performance standards require BLM and mining operators to "take such action as may be needed to prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations," 43 C.F.R. § 3809.420(b)(7), and "conduct all operations in a manner that complies with all pertinent Federal and state laws," including NEPA and the ESA, 43 C.F.R. § 3809.420(a)(6).

100.    BLM did not require Rover to take such action as may be needed to prevent adverse impacts to threatened or endangered species and their habitat which may be affected by its operations. 43 C.F.R. § 3809.420(b)(7).

101.    BLM is required to ensure that notice level operations do not cause UUD, as the operator must include a detailed description of "[t]he measures that you will take to prevent unnecessary or undue degradation during operations." 43 C.F.R. § 3809.301(b)(2)(i).  BLM failed to require Rover to provide the necessary information to ensure the prevention of UUD, and thus failed to prevent UUD.

102.    BLM's failure to consult with the U.S. Fish and Wildlife Service as required under ESA Section 7(a)(2) violates the ESA. *See* 16 U.S.C. § 1536(a)(2). BLM's failure to prepare an Environmental Assessment or Environmental Impact Statement violates NEPA. *See* 42 U.S.C. § 4332. The proposed exploration activities therefore do not comply with all pertinent Federal and state laws. 43 C.F.R. § 3809.420(a)(6).

103.    BLM has not taken action to avoid or mitigate the impacts of Rover's operations, including adverse impacts to groundwater and contamination from drilling fluids and unlined sumps.

104.    For all of these reasons, BLM has failed to prevent UUD in connection with Rover's exploration activities, and has violated FLPMA. 43 U.S.C. § 1732(b).

105.     BLM's actions and omissions regarding the Project and Rover's NOI are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

106.     Alternatively, BLM's failure to take actions necessary to prevent UUD constitutes agency action unlawfully withheld or unreasonably delayed within the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

### THIRD CLAIM FOR RELIEF

BLM Violated NEPA

107.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

108.     NEPA and its implementing regulations require federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1502.3. An agency may first prepare an environmental assessment (EA) to determine whether an EIS is necessary. 40 C.F.R. § 1501.5.

109.     Whether the agency prepares an EA or an EIS, the agency must take a "hard look" at all direct, indirect, and cumulative environmental impacts of the proposed action and reasonable alternatives thereto. *Kern v. United States BLM*, 284 F.3d 1062, 1071 (9th Cir. 2002); 40 C.F.R. § 1502.1.

110.     According to BLM's own regulations and Handbook, BLM is required to prepare an EA or EIS for any mineral operations on public lands which do not qualify as "casual use" or "notice" operations. 43 C.F.R. § 3809.411; BLM Handbook H-3809-1, § 4.4.1.3.2 (NEPA Analysis); 42 U.S.C. § 4332(C).

111.     The Project does not qualify as "casual use." *See* 43 C.F.R. § 3809.5.

112.     The Project does not quality as a "notice" operation because will take place in and disturb the Ash Meadows and/or Amargosa Mesquite ACECs; and because it will take place on

lands and waters known to harbor and sustain threatened and endangered species, and may likely affect those species and their habitat. *See* 43 C.F.R. § 3809.11.

113.    BLM failed to prepare an EA or EIS to analyze the Project's direct, indirect, and cumulative impacts, as well as the other requirements of NEPA.

114.    BLM's actions and omissions regarding the Project and Rover's March 22, 2023 NOI therefore violate NEPA and are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

115.    Alternatively, BLM's failure to prepare an EA or EIS constitutes agency action unlawfully withheld or unreasonably delayed within the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that BLM has violated FLPMA and BLM's regulations in allowing, approving and authorizing the Project;

B.    Declare that the BLM has violated NEPA in allowing, approving and authorizing the Project;

C.    Enjoin any implementation of the Project;

D.    Vacate BLM's actions authorizing, allowing or approving the Project;

E.    Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.    Grant Plaintiffs such further relief as may be just, proper, and equitable.

Dated July 7, 2023                    Respectfully submitted,

*/s/ Scott Lake*

Scott Lake
Center for Biological Diversity
P.O. Box 6205
Reno, NV 89513
(802) 299-7495
slake@biologicaldiversity.org

*/s/ Roger Flynn*

Roger Flynn
Western Mining Action Project
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
(*pro hac vice application to be submitted*)

*Attorneys for Plaintiffs*