SCOTT LAKE
NV Bar No. 15765
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 6205
Reno, NV 89513
Phone: (802) 299-7495
Email: slake@biologicaldiversity.org

ROGER FLYNN
CO Bar No. 21078
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
Phone: (303) 823-5738
Email: roger@wmaplaw.org
(*pro hac vice application pending*)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CENTER FOR BIOLOGICAL DIVERSITY
and AMARGOSA CONSERVANCY,

    Plaintiffs,

vs.

DEBRA HAALAND in her official capacity
as Secretary of the Interior, TRACY STONE-
MANNING in her official capacity as the
Director of the Bureau of Land Management,
U.S DEPARTMENT OF THE INTERIOR,
BUREAU OF LAND MANAGEMENT, and
NICHOLAS B. PAY in his official capacity
as Field Manager of the Bureau of Land
Management Pahrump Field Office,

    Defendants.

Case No: 2:23-cv-1049-JAD-NJK

**MOTION FOR PRELIMINARY
INJUNCTION AND MEMORANDUM IN
SUPPORT**

***ORAL ARGUMENT REQUESTED***

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

LIST OF EXHIBITS .......................................................................................................... vii

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 2

I.      Ash Meadows National Wildlife Refuge ............................................................ 2

II.     The Proposed Drilling Project ............................................................................ 5

III.    Environmental Impacts from the Proposed Drilling ......................................... 8

STANDARD OF REVIEW ..................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

I.      Plaintiffs Are Likely to Succeed on the Merits ............................................... 11

A.      BLM Violated FLPMA and the Mining Regulations Because it Failed
        to Prevent Unnecessary and Undue Degradation (UUD) Under FLPMA ............... 11

B.      BLM Violated FLPMA and the Mining Regulations Because the Project
        Does Not Qualify as a "Notice" Operation ................................................... 15

C.      BLM Violated NEPA and the Mining Regulations Because It Did Not
        Prepare an Environmental Assessment or Environmental
        Impact Statement ................................................................................. 19

II.     Injunctive Relief is Needed to Prevent Irreparable Harm. ............................. 20

III.    The Balance of Equities Favors an Injunction ................................................. 22

IV.     The Public Interest Favors an Injunction ........................................................ 22

V.      No Bond Should be Required ........................................................................... 23

CONCLUSION ................................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

### <u>*Federal Caselaw*</u>

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .................................................................................11, 23

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
480 U.S. 531 (1987) .................................................................................................20, 22

*Cal. Ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*,
766 F.2d 1319 (9th Cir. 1985) ........................................................................................23

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ..........................................................................................18

*Ctr. for Biological Diversity v. Jewell*,
CV-15-019-TUC-JGZ, 2018 WL 1586651 (D. Ariz. 2018) ...........................................21

*City of South Pasadena v. Slater*,
56 F.Supp. 2d 1106 (C.D. Cal. 1999) .............................................................................23

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ..........................................................................................23

*Envtl. Prot. Info. Ctr. v. Carlson*,
968 F.3d 985 (9th Cir. 2020) ..........................................................................................21

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*,
630 F.3d 1153 (9th Cir. 2011) ........................................................................................23

*Friends of the Earth v. Brinegar*,
518 F.2d 322 (9th Cir. 1975) ..........................................................................................23

*High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2004) ..........................................................................................21

*Karuk Tribe of California v. U.S. Forest Service*,
681 F.3d 1006 (9th Cir. 2012) ........................................................................................15

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) ............................................................................................17, 18

*Kern . U.S. BLM*,
284 F.3d 1062 (9th Cir. 2002) ........................................................................................19

*Kootenai Tribe v. Veneman*,
313 F.3d 1094 (9th Cir. 2002) ........................................................................................22

*Lands Council v. McNair,*
537 F.3d 723 (9th Cir. 2008) ........................................................................23

*League of Wilderness Defs. v. Connaughton,*
752 F.3d 755 (9th Cir. 2014) ........................................................................22

*Mineral Policy Center v. Norton,*
292 F.Supp.2d 30 (D.D.C. 2003) ..................................................................18

*Save Our Sonoran v. Flowers,*
408 F.3d 1113 (9th Cir. 2005) ......................................................................21

*South Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior,*
588 F.3d 718 (9th Cir. 2009 ....................................................................21, 22

*Thomas v. Peterson,*
753 F.2d 754 (9th Cir. 1985) ........................................................................15

*W. Watersheds Proj. v. Zinke,*
336 F. Supp. 3d 1204 (D. Idaho 2018) .........................................................11

*Winter v. Natural Resources Defense Council,*
555 U.S. 7 (2008) ...................................................................................11, 20

**<u>Federal Statutes</u>**

Endangered Species Act (ESA)
16 U.S.C. § 1532(5)(a) ...................................................................................4

16 U.S.C. § 1536(a)(2) .......................................................................7, 14, 15

16 U.S.C. § 1536(b) ...................................................................................... 14

Federal Land Policy and Management Act ("FLPMA"),
43 U.S.C. §§ 1701 *et seq.* ..................................................................... *passim*

FLPMA,
43 U.S.C. § 1701(a)(8) .................................................................................11

FLPMA,
43 U.S.C. § 1732 ...................................................................................6, 11

Federal Rule of Civil Procedure, Rule 65 ..................................................1, 23

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ..................................................................... *passim*

iv

NEPA
42 U.S.C. § 4331 ..................................................................................................19

NEPA
42 U.S.C. § 4332 ...............................................................................10, 16, 19, 20

***Federal Regulations***

40 C.F.R. § 1501.3 ...............................................................................................19

40 C.F.R. § 1501.5 ...............................................................................................19

40 C.F.R. § 1502.1 ...............................................................................................20

40 C.F.R. § 1502.3 ...............................................................................................19

43 C.F.R. § 3809.1 ...............................................................................................12

43 C.F.R. § 3809.5 ..........................................................................................16, 17

43 C.F.R. § 3809.10 .............................................................................................15

43 C.F.R. § 3809.11 .......................................................10, 15, 16, 17, 18, 19

43 C.F.R. § 3809.15 .............................................................................................13

43 C.F.R. § 3809.21 .....................................................................................1, 5, 16

43 C.F.R. § 3809.311 ......................................................................................12, 17

43 C.F.R. § 3809.411 ................................................10, 12, 16, 17, 19, 20

43 C.F.R. § 3809.420 ................................................11, 12, 13, 14, 15, 18

50 C.F.R. § 402.14 ...............................................................................................14

***Other Authority***

46 Fed. Reg. 40178 (Jan. 5, 1983) ........................................................................4

50 Fed. Reg. 20777 (May 20, 1985) ......................................................................4

65 Fed. Reg. 69998 (Nov. 21, 2000)................................................................12, 15

66 Fed. Reg. 54834 (Oct. 30, 2001) ...........................................................17, 18, 19

80 Fed. Reg. 59857 (Oct. 2, 2015)........................................................................11

85 Fed. Reg. 3413 (Jan. 21, 2020)........................................................................17

85 Fed. Reg. 43304 (July 16, 2020)........................................................................21

Interior Solicitor's Opinion M-37039 (2016) ...................................................12, 15

Interior Solicitor's Opinion M-37075 (2022) ...................................................12, 15

BLM Handbook H-3809-1.............................................................................16, 19, 20

**Exhibit List for Plaintiffs' Motion for Preliminary Injunction**

1. Lake Declaration

2. Donnelly Declaration

3. U.S. Fish and Wildlife Service, *Desert National Wildlife Refuge Complex, Final Conservation Plan and Environmental Impact Statement* (August 2009)) ["Conservation Plan"]

4. Parmenter Declaration

5. Don W. Sada, U.S. Fish and Wildlife Service, *Recovery Plan for the Threatened and Endangered Species of Ash Meadows, Nevada* (Sept. 28, 1990) ["Recovery Plan"]

6. U.S. Fish and Wildlife Service, *Ash Meadows National Wildlife Refuge, Water Resource Inventory and Assessment* (January 2014) ["FWS Water Report"]

7. U.S. Fish and Wildlife Service, Ash Meadows Amargosa Pupfish (*Cyprinodon nevadensis mionectes*) Five-Year Review: Summary and Evaluation (Mar. 17, 2010) ["Five-Year Review"]

8. U.S. Department of the Interior, Bureau of Land Management, Las Vegas and Pahrump Field Offices, Updated Record of Decision for the Approved Las Vegas Resource Management Plan and Final Environmental Impact Statement, (July 2019) ["RMP"]

9. Rover Metals Notice of Intent (NOI)

10. Letter from Erika Gerling, Beatty Town Advisory Board Chair, to Nicholas B. Pay, BLM Field Manager, Pahrump Field Office (June 29, 2023)

11. Zdon Declaration

12. Sorrells Declaration

13. Voehl Declaration

14. Interior Solicitor's Opinion, M-37039 (2016)

15. Interior Solicitor's Opinion, M-37075 (2022)

**INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 65(b), Plaintiffs in this action request a preliminary injunction (PI) to prevent irreparable harm from imminent development of Rover Metals (USA), Inc.'s (Rover) "Let's Go Lithium" exploratory mineral drilling project (the Project) adjacent to Ash Meadows National Wildlife Refuge, a biodiversity hotspot of global significance with one of the highest concentrations of endemic species in the world. The Project presents an immediate threat of irreparable harm to the groundwater resources on which all species in the Refuge depend, and will permanently mar the unique desert landscape in Amargosa Valley.

On January 20, 2023, Rover submitted a Notice of Intent (NOI) pursuant to 43 C.F.R. § 3809.21 to Defendant U.S. Bureau of Land Management (BLM) to conduct mineral exploration drilling and other Project operations in the Ash Meadows area. After discussions with BLM, Rover submitted a revised NOI on March 22, 2023. On April 5, 2023, BLM approved Rover's modified NOI and ordered the company to pay a minimal reclamation bond of $30,003.00. Based on communications with government counsel, BLM has approved the reclamation bond and operations are slated to begin on August 1, 2023.

Recently, though, BLM stated in the press that it has paused drilling operations indefinitely pending additional environmental review and submission of a Plan of Operations, *see* Colton Lochhead, *Lithium drilling plans near Ash Meadows refuge on pause*, Las Vegas Review-Journal (July 13, 2023), available at: https://www.reviewjournal.com/news/politics-and-government/ lithium-drilling-plans-near-ash-meadows-refuge-on-pause-2871536/. Counsel for Defendants has been unable to confirm the accuracy of these statements to Plaintiffs. On July 14, 2023, counsel for Defendants informed counsel for Plaintiffs via email that Defendants were "aware of the press statement," but stated that "BLM has not yet issued any final decision." Exh. 1 (Lake Decl.) ¶ 10. Defendants' counsel further informed Plaintiffs' counsel that until BLM issues a final decision, Defendants' counsel could not "say with certainty what Rover's regulatory status is or will be." *Id.*

Accordingly, in order to prevent irreparable harm to irreplaceable public resources, including Ash Meadows National Wildlife Refuge and the several federally listed threatened and endangered species that live there, Plaintiffs respectfully request that this Court enjoin any implementation of BLM's April 5, 2023 decision to approve Rover's NOI and the proposed drilling operations pending resolution of the merits of this action.

## FACTUAL BACKGROUND

### I. Ash Meadows National Wildlife Refuge.

Ash Meadows National Wildlife Refuge encompasses 24,000 acres of Mojave Desert wetland and upland habitat in southern Nevada near the town of Amargosa Valley. Exh. 2 (Donnelly Decl.) ¶ 16; Exh. 3 (U.S. Fish and Wildlife Service, *Desert National Wildlife Refuge Complex, Final Conservation Plan and Environmental Impact Statement* (August 2009)), at 186 ["Conservation Plan"]. The U.S. Fish and Wildlife Service established the Refuge in 1984 from acquired private lands and BLM public lands in order to preserve the numerous threatened, endangered, and sensitive plant and animal species that depend on the area's unique groundwater systems and springflows. Exh. 4 (Parmenter Decl.) ¶ 9; Exh. 5 (Don W. Sada, U.S. Fish and Wildlife Service, *Recovery Plan for the Threatened and Endangered Species of Ash Meadows, Nevada* (Sept. 28, 1990)), at 5 ["Recovery Plan"].

Ash Meadows is essentially a watered island amidst one of the most arid regions in the world, and the largest remaining natural oasis on the Amargosa River. *Id.* at 12. Groundwater-fed springs throughout the Refuge support relict plants and animals that moved into the region during wetter climactic periods and have since been isolated by miles of dry desert. *See id.* As a result of this isolation, and through their adaptation to the unique environmental conditions at Ash Meadows, many of these plants and animals have evolved into unique species that are considered "endemic" to the area—meaning they are found here and nowhere else on Earth. *Id.* at 12, 15; Exh. 2 (Donnelly Decl.) ¶ 14-17. According to FWS, the Ash Meadows has "one of the highest concentrations of endemic species found in the United States." Exh. 6 (U.S. Fish and Wildlife Service, *Ash Meadows National Wildlife Refuge, Water Resource Inventory and Assessment*

(January 2014)), at 7 ["FWS Water Report"]. In 1986, Ash Meadows became the fourth designated Ramsar Convention Wetland of International Importance in the United States, described by Ramsar as "an area exhibiting the greatest biological endemism in the USA." Ramsar Sites Information Service, Ash Meadows National Wildlife Refuge, https://rsis.ramsar.org/ris/347 (last accessed July 7, 2023).[1]

The Refuge's groundwater-dependent springs and associated surface-water flows create unique and diverse aquatic and wetland habitats for the following species listed as threatened or endangered under the Endangered Species Act (ESA):

- Ash Meadows Amargosa pupfish (*Cyprinodon nevadensis mionectes*), endangered;
- Ash Meadows speckled dace (*Rinichtys osculus nevadensis*), endangered;
- Warm Springs pupfish (*Cyprinodon nevadensis pectoralis*), endangered;
- Devil's Hole pupfish (*Cyprinodon diabolis*), endangered;
- Ash Meadows blazing star (*Mentzelia leuciphylla*), threatened;
- Amargosa niterwort (*Nitrophila Mohavensis*), endangered;
- Ash Meadows milkvetch (*Astragulus phoenix*), threatened;
- Ash Meadows sunray (*Enceliopsis nudicaulis corrugata*), threatened;
- Ash Meadows gumplant (*Grindelia fraxinoperatensis*), threatened;
- Ash Meadows ivesia (*Ivesia Kingii var. eremica*), threatened;
- Spring-loving centaury (*Zeltnera namophila*), threatened;
- Ash Meadows naucorid bug (*Ambysus amargosus*), threatened.

---

[1] Ramsar sites are designated under the authority of the Convention on Wetlands, an intergovernmental treaty adopted in Ramsar, Iran in 1971. The Convention on Wetlands is the oldest of the modern global intergovernmental environmental agreements. Designated Wetlands of International Importance such as Ash Meadows "are recognized as being of significant value not only for the country or the countries in which they are located, but for humanity as a whole." *See* https://www.ramsar.org/about-the-convention-on-wetlands-0.

*See generally* 46 Fed. Reg. 40,178-86 (Jan. 5, 1983); 50 Fed. Reg. 20,777-94 (May 20, 1985); Exh. 4 (Parmenter Decl.) ¶ 12-13 ("Almost all species at Ash Meadows are critically dependent on the water resources of the Refuge."); Exh. 6 (FWS Water Report), at 7; *see also* Parmenter Decl., ¶ 16 ("Biodiversity at Ash Meadows is dependent on the relatively stable discharge of groundwater from springs and seeps across the Refuge").

FWS has designated critical habitat for all of the threatened and endangered species at the Refuge except the Warm Springs pupfish, encompassing all of the areas where the species are found. 46 Fed. Reg. 40178-86; 50 Fed. Reg. 20777-94; *see also* 16 U.S.C. § 1532(5)(A) (explaining that areas designated as critical habitat are "essential" to the "conservation of the species"). Designated critical habitat thus includes the Refuge springs and their associated surface flows. *See also* Exh. 2 (Donnelly Decl. at 7, Figure 1, map of area and Project operations).

The Refuge contains seven springs which historically have discharged at rates greater than 500 gallons per minute (1.1. cubic feet per second), and an additional 25-50 springs discharging less than 500 gallons per minute. Exh. 6 (FWS Water Report), at 5. Combined, these springs discharge about 17,000 acre-feet per year of surface water and create one of the most ecologically significant areas of surface water in the Mojave Desert. *Id.*

Fairbanks Spring is the northernmost spring at the Refuge and the closest to the Project's proposed drilling into the groundwater. Exh. 2 (Donnelly Decl.) ¶¶ 18, 20, and Figure 1. It contributes substantial surface flow to the overall Ash Meadows flow system. *Id.* ¶ 18. Fairbanks Spring is home to, and crucial habitat for, the endangered Ash Meadows Amargosa pupfish. 46 Fed. Reg. 40,178-86. It has also been the site of intensive habitat restoration efforts by the FWS, to restore and enhance the populations of this rare endemic species. Exh. 7 (U.S. Fish and Wildlife Service, Ash Meadows Amargosa Pupfish (*Cyprinodon nevadensis mionectes*) Five-Year Review: Summary and Evaluation (Mar. 17, 2010)), at 26 ["Five-Year Review"]. Fairbanks Spring and the two other major springs in the northern portion of the Refuge—Longstreet and Rogers—are relatively cool compared with other springs in the refuge, suggesting they receive flow from the

shallow groundwater aquifer to the north or northeast, within the Project area. Exh. 6 (FWS Water Report), at 22.

BLM has established the Ash Meadows ACEC (Area of Critical Environmental Concern) and the Amargosa Mesquite ACEC to protect the irreplaceable biodiversity in and around the Refuge, with particular emphasis on groundwater-dependent ecosystems and threatened and endangered species. Exh. 8 (U.S. Department of the Interior, Bureau of Land Management, Las Vegas and Pahrump Field Offices, Updated Record of Decision for the Approved Las Vegas Resource Management Plan and Final Environmental Impact Statement, (July 2019)), at 19 ["RMP"]. Both ACECs are closed to mineral location, restrict off-highway vehicle (OHV) travel to existing roads and trails, and prohibit rights-of-way (ROW) except in previously designated ROW corridors. *Id.* The Ash Meadows ACEC is closed to both fluid mineral leasing and livestock grazing, while fluid mineral leasing in the Amargosa Mesquite ACEC is subject to significant restrictions. *Id.* BLM's management direction regarding these areas reflects an intent to prohibit significant human disturbance for the benefit of wildlife and wildlife habitat, including federally listed threatened and endangered species and their designated critical habitat.

## II.   **The Proposed Drilling Project**.

Rover Metals is a Canadian mining company with an office in Reno, Nevada that is proposing development of a hardrock lithium open-pit mining operation on federal public lands in Amargosa Valley adjacent to the Refuge, the Ash Meadows ACEC, and the Amargosa Mesquite ACEC. This project is known as the "Let's Go Lithium Project." As a precursor to actual mining, on January 20, 2023, Rover filed a Notice of Intent (NOI) pursuant to 43 C.F.R. § 3809.21 to conduct mineral exploration drilling in the Ash Meadows area. *See* Exh. 9 (NOI); Exh. 2 (Donnelly Decl.) ¶ 31.  Rover's intent, as stated in the NOI, was to "test alluvium and bedrock for lithium content." NOI at 5. After discussions with BLM, Rover submitted a revised NOI on March 22, 2023. Donnelly Decl. ¶ 31-32.

Rover's March 22 NOI, as approved by BLM, includes up to 30 drilling sites. The Project area is adjacent to the Refuge and drilling is proposed within 2,000 feet of Fairbanks Spring. *See*

Exh. 2 (Donnelly Decl. at 7, Figure 1). The NOI acknowledges that "[a]ll drill holes will be expected to intersect ground water." Exh. 9 (NOI), at 4; *see also id.* at 6   ("[G]roundwater is expected to be encountered in each drill hole."). The "drill holes [are] planned to [be] 250 to 300 feet deep each." *Id.* at 4. According to the NOI, boreholes from exploratory drilling will be "plugged according to State of Nevada requirements," *id.* at 8, but the NOI contains no specific information on whether or how Rover intends to avoid, minimize, or mitigate any impacts caused by puncturing the groundwater aquifer, and no measures for controlling artesian flow if encountered.

To dispose of the waste generated by the drilling operations, the Project will involve the excavation of open-air pits, called sumps, for each of the 30 proposed boreholes. *See id.* at 4. The NOI does not include any mitigation measures to control the waste from the drilling, such as lining the sumps to prevent groundwater contamination. Nor does the NOI explain what drilling chemicals or compounds will be used.

According to the NOI, Rover intends to access its drilling sites "by established unpaved roads off of Highway 160 or State Route 373." *Id.* at 2. As shown on the map, many of these unpaved routes run through the Ash Meadows and Amargosa Mesquite ACECs. *See* Exh. 2 (Donnelly Decl., at 7, Fig. 1). The NOI does not specify where overland travel will occur, and it does not include any language indicating that Rover intends to avoid travel through the two ACECs.

On April 5, 2023, BLM accepted Rover's modified NOI and ordered the company to pay a minimal bond of $30,003.00. Exh. 2 (Donnelly Decl.) ¶¶ 31-32.

Rover's NOI does not describe how the company will "prevent unnecessary and undue degradation" to public lands and resources resources—including the springs, fish, wildlife and habitats that depend upon these waters—from impacts to groundwater hydrology and/or springflows, as required by FLPMA. *See* 43 U.S.C. §1732(b). Moreover, BLM has not consulted with FWS pursuant to Section 7(a)(2) of the ESA to ensure that the proposed drilling operations do not jeopardize the continued existence of any threatened or endangered species or adversely

modify designated critical habitat. *See* 16 U.S.C. § 1536(a)(2). In fact, according to information obtained by Plaintiffs, BLM did not even inform FWS of the Project before allowing it to go forward. Exh. 2 (Donnelly Decl.) ¶¶ 35-36.

Opposition to BLM's approval of the Project has not been limited to Plaintiffs or environmental interests. On June 29, 2023 the nearby Town of Beatty, Nevada sent BLM a letter formally registering its opposition to the Project—and specifically to BLM's hasty approval of Rover's NOI—due to the likelihood of irreversible impacts to water resources in the area. The Town's letter stated: "Allowing Rover Metals, or any company to conduct this type of potentially destructive, water intensive and invasive[] activity so close to a declared refuge and ACEC seems to contradict the goal of sustaining the health and diversity of our public lands for the use and enjoyment of present and future generations of all species." Exh. 10 (Letter from Erika Gerling, Beatty Town Advisory Board Chair, to Nicholas B. Pay, BLM Field Manager, Pahrump Field Office (June 29, 2023)), at 1. The Town specifically requested that BLM "halt this exploration project until the proper environmental, hydrological, and other applicable studies can be completed," including "formal consultation with the U.S. Fish and Wildlife Service regarding the potential impacts of the project," a "Plan of Operations . . . for the project," and "an environmental review of the Plan of Operations in accordance with NEPA to include an Environmental Assessment or an Environmental Impact Statement as appropriate." *Id.* at 2.

All available evidence indicates that drilling is imminent. On June 30, 2023, in response to a Center inquiry, BLM stated:

> Rover Metals is actively working with the Nevada State Office to get their Financial Guarantee in place in accordance with the regulations found in 43 CFR 3809. Once that financial guarantee has been adjudicated by the team at the State Office they will send out an acceptance letter to the operator. Once the financial guarantee has been accepted then the operator is able to carry out the work identified in their notice consistent with the Mining Law of 1872 (30 U.S.C. 22 et seq.) and the implementing regulations found in 43 CFR 3809.

Exh. 2 (Donnelly Decl) ¶ 34. Rover, meanwhile, has stated publicly that it will "start drilling in mid-July." Stockhouse, *Rover Metals is Ready to Drill* (June 27, 2023),

https://stockhouse.com/news/the-market-herald-news/2023/06/27/rover-metals-ready-to-drill.

After this lawsuit was filed and in response to inquiries from Plaintiffs' counsel, Defendants' counsel stated that Rover subsequently informed BLM operations would commence on or after August 1, 2023. Exh. 1 (Lake Decl.) ¶ 5.

However, on July 13, 2023, BLM stated to the Las Vegas Review-Journal, in reference to the Project: "Nothing is going to happen until we do a complete (National Environmental Protection Act) review,  . . . Exploratory drilling is on hold until Rover submits a plan of development." Colton Lochhead, *Lithium drilling plans near Ash Meadows refuge on pause*, Las Vegas Review-Journal (July 13, 2023), available at: https://www.reviewjournal.com/news/ politics-and-government/lithium-drilling-plans-near-ash-meadows-refuge-on-pause-2871536/. The article further explained that "BLM officials told representatives from Rover Metals, a Canadian minerals exploration company, of the requirements in a meeting Wednesday [July 12]." *Id*. Plaintiffs were subsequently unable to determine the accuracy of these statements. On July 14, 2023, responding to inquiries from Plaintiffs' counsel via email, Defendant's counsel stated: "we are aware of the press statement, but BLM has not yet issued any final decision. Until it does, I cannot say with certainty what Rover's regulatory status is or will be." Exh. 1 (Lake Decl.) ¶ 10.

**III.**  **Environmental Impacts from the Proposed Drilling.**

The Project is likely to cause irreparable harm to the groundwater resources on which the Refuge depends, and may adversely affect threatened and endangered species within the Refuge, as well as their designated critical habitat. *See* Exh. 11 (Zdon Decl.) ¶ 29; Exh. 4 (Parmenter Decl.) ¶ 24-25. FWS, which administers the Refuge, has recognized that protecting the groundwater aquifer in the Amargosa Basin is critical to conserving the many threatened, endangered, and endemic species that exist only at Ash Meadows. According to FWS, "[a]ctivities that may cause adverse [e]ffects [to listed species] include those that alter spring discharge quantities and routes, stable soil conditions (including drainage patterns from surrounding topography), and native vegetation." Exh. 5 (Recovery Plan) at 27. Similarly, "[s]ubstantial evidence" collected by the U.S.

Geological Survey "shows that spring discharge [in the Refuge] is intimately related to the viability of the . . . aquifer." *Id.* at 38-39.

Changes in groundwater flow and elevation—including changes in shallow subsurface water and the basin-fill aquifer—could affect the flow, temperature, and chemical content of springs to which endemic species in the Refuge are adapted. Exh. 7 (Five-Year Review) at 15. All of the threatened and endangered species within the Refuge depend on spring systems arising from a regional groundwater flow system called the "carbonate aquifer," as well as its nexus with the basin fill and other local subsurface water. *See id.*; Exh. 11 (Zdon Decl.) ¶ 8. Disruptions to the surface and subsurface hydrology are recognized as particularly acute threats to groundwater-dependent species such as the Ash Meadows Amargosa pupfish. Exh. 7 (Five-Year Review) at 15.

Mining and mining exploration are well-recognized threats to the threatened and endangered species at Ash Meadows. *See id.* at 17-18. According to FWS, "[n]ew mineral claims and subsequent mining could cause direct loss of . . . fish habitat, as well as indirect impacts by diverting or draining water away from occupied habitat." *Id.* Because if their potential impacts, mineral operations are incompatible with the Refuge's purposes. *Id.* at 18.

As acknowledged by Rover, drilling within the Project area will intersect groundwater that is in hydrologic communication with the Refuge springs. Exh. 9 (NOI), at 6; Exh. 11 (Zdon Decl.) ¶¶ 8, 22. And, based on past drilling in the area, it is a "virtual certainty" that Rover's proposed drilling will encounter artesian conditions (i.e., groundwater under pressure), increasing the risk of adverse and irreversible hydrologic impacts. *Id.* ¶ 22. It is therefore likely that drilling will harm the groundwater aquifer that supplies water at the Refuge springs and the threatened and endangered species in the Refuge that depend on this resource. *Id.* ¶ 29. Nevertheless, neither BLM nor Rover have proposed or analyzed measures to contain artesian flows and pressures.

The likelihood of irreparable harm to the groundwater resource and the Refuge springs is amply demonstrated by the nearby case of "the Borehole" or "Borehole Spring." *See id..* ¶ 23. The site on the Amargosa River south of Ash Meadows in Tecopa, California, now known as "the Borehole" or "Borehole Spring," was created by mineral exploration drilling in the 1960s that

encountered artesian flow at a depth of 360 feet. *Id.* ¶ 24. Attempts to plug the Borehole failed and the resulting artesian flow continues to the present day. *Id.* Creation of the Borehole depressurized the surrounding aquifer, lowering groundwater levels, decreasing spring discharge, and causing at least one nearby spring to dry up completely. *Id.* ¶ 25. Hydrologic impacts from the creation of the Borehole have been observed several miles away from the site itself. *Id.* ¶ 25-26; Exh. 12 (Sorrells Decl.) ¶ 24. The case of the Borehole demonstrates that when exploratory drilling encounters artesian conditions in the Amargosa Basin, it can have significant and far-reaching impacts to groundwater hydrology and springflows.

In addition to hydrologic impacts, the Project will impact previously undisturbed upland habitats with heavy equipment, drilling rigs, and the creation of new access routes. Exh. 2 (Donnelly Decl.) ¶ 38; Exh. 13 (Voehl Decl.) ¶ 25; Exh. 12 (Sorrells Decl.) ¶ 28. Affected habitats include creosote shrublands and mesquite woodlands, which will be disturbed, de-vegetated, and irreparably damaged by Rover's proposed activities. *Id.* These areas provide important wildlife habitat and are contiguous with protected habitats within the Amargosa Mesquite ACEC, the Ash Meadows ACEC, and the Refuge *See* Exh. 2 (Donnelly Decl), at 7, Fig. 1.

Despite the potentially catastrophic impacts to threatened and endangered species and sensitive wildlife habitats, and despite the fact that Rover's NOI contains no information on whether or how Rover intends to avoid, minimize, or mitigate any direct, indirect, or cumulative impacts from its proposed drilling operations—especially to the area's unique and invaluable groundwater resources and springs—BLM accepted Rover's NOI and did not require the company to submit a Plan of Operations or conduct the appropriate level of NEPA and FLPMA analysis as required by its own regulations at 43 C.F.R. §§ 3809.11 and 3809.411, and NEPA at 42 U.S.C. § 4332. Preliminary injunctive relief is necessary to prevent irreparable harm stemming from BLM's unlawful approval of Rover's proposed drilling project.

## STANDARD OF REVIEW

A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities

favors relief, and (4) that an injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011), *quoting Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding-scale approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction" if the irreparable injury and public interest elements are satisfied. *All. for the Wild Rockies*, 632 F.3d at 1135 (internal quotation marks omitted). When a plaintiff has met this standard, a court may issue an injunction to preserve the environmental status quo pending a final decision on the merits. *W. Watersheds Proj. v. Zinke*, 336 F. Supp. 3d 1204, 1218-19 (D. Idaho 2018).

## ARGUMENT

### I. Plaintiffs are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits of their claims. BLM's approval and authorization of the Project violated FLPMA, NEPA, and BLM's own regulations governing mining exploration on federal public lands.

#### A. BLM Violated FLPMA and the Mining Regulations Because it Failed to Prevent Unnecessary and Undue Degradation (UUD).

FLPMA is the "organic act" of BLM and governs the agency's management of public lands and resources. In FLPMA, Congress declared that is the policy of the United States to manage the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values" and that, "where appropriate, will preserve and protect certain public lands in their natural condition." 43 U.S.C. § 1701(a)(8). FLPMA requires that BLM, in managing the public lands, "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation [UUD] of the lands." 43 U.S.C. § 1732(b). This is known as the "prevent UUD" standard.

BLM has promulgated regulations intended to prevent UUD by operations authorized under the mining laws. *See* 43 C.F.R. § 3809.1(a). Mining exploration operations—whether authorized under an NOI or a more detailed Plan of Operations (Plan)—must prevent UUD by

adhering to BLM's regulatory performance standards at 43 C.F.R. § 3809.420. *See* 43 C.F.R. § 3809.415. The performance standards specify that BLM and mining operators must, among other things, "take such action as may be needed to prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations," 43 C.F.R. § 3809.420(b)(7), and "conduct all operations in a manner that complies with all pertinent Federal and state laws," including the ESA, 43 C.F.R. § 3809.420(a)(6). BLM cannot approve an operation that would cause UUD. 43 C.F.R. §§ 3809.311(c); 3809.411(d)(3)(iii).

BLM may require mining operators to prevent UUD through mitigation. 43 C.F.R. § 3809.420(a)(4). According to BLM policy, "[m]itigation measures fall squarely within the actions [BLM] can direct to prevent unnecessary or undue degradation of the public lands. An impact that can be mitigated, but is not, is clearly unnecessary." 65 Fed. Reg. 69998, 70052 (Nov. 21, 2000) (preamble to rule section that remains in force); *see also* Exh. 14 (M-37039, *The Bureau of Land Management's Authority to Address Impacts of its Land Use Authorizations through Mitigation*, (Dec. 21, 2016)) at 19-20. In detailing part of BLM's duty to prevent UUD under FLPMA, the Interior Solicitor reaffirmed that:

> [I]t is well established that the UUD provision under FLPMA provides another basis for requiring mitigation in those circumstances where impacts in the absence of mitigation would be unnecessary or undue. Although mitigation may contribute in some instances to the avoidance of UUD, in other cases, the impacts to resources may be of a nature or magnitude such that they cannot be mitigated sufficiently to prevent UUD. *For example, the destruction of unique habitat in a particular place might not be adequately compensated by post-use restoration or protection of lesser habitat elsewhere. In such a case, where mitigation cannot prevent UUD, the BLM has authority to reject the application for approval of the public land use based on the proponent's inability to prevent UUD.* The obligation to avoid UUD is a complementary but distinct source of authority for requiring mitigation under FLPMA.

Exh. 14 (M-37039) at 20 (reinstated by M-37075 (Exh. 15)) (April 15, 2022) (emphasis added).

BLM and Rover have failed to prevent UUD here because they have not taken action needed to "prevent adverse impacts to threatened and endangered species, or their habitat which may be affected" by the proposed drilling. 43 C.F.R. § 3809.420(b)(7). Rover's drilling area is

adjacent to the Refuge, with some of the proposed drilling sites is less than 2,000 feet from Fairbanks Spring. Exh. 11 (Zdon Decl.) ¶ 9; Exh. 2 (Donnelly Decl.) at 7, Figure 1. Rover anticipates that all of its boreholes will encounter groundwater. Exh. 9 (NOI), at 4, 6. Nearby springs, including Fairbanks, Rogers, and Longstreet Springs, derive their flow almost entirely from groundwater. Exh. 11 (Zdon Decl.) ¶ 8. Further, water temperatures at Fairbanks, Rogers, and Longstreet springs, indicate that they receive flow from the shallow groundwater aquifer to the north or northeast, which is precisely where Rover intends to drill. Exh. 6 (FWS Water Report), at 22.

The "virtual certainty" that Rover's drilling will encounter artesian flow heightens this risk to the springs. Exh. 11 (Zdon Decl.) ¶¶ 22-26.  Artesian conditions indicate that the aquifer is under pressure, and any drilling that relieves that pressure has the potential to dramatically alter hydrologic conditions within the aquifer and impact nearby springs. *See id*. All known wells previously drilled within the Project area and in close proximity to the Refuge have encountered artesian conditions, and artesian conditions are known to exist throughout the valley surrounding Ash Meadows. *Id*. ¶¶ 16-22. And a past mineral exploration project within the same hydrologic system as Ash Meadows demonstrates how severely drilling into a pressurized aquifer can affect the surrounding area. *Id.* ¶¶ 23-26.

Mineral exploration drilling in the 1960s in the Amargosa River basin encountered artesian flow at a depth of 360 feet. *Id*. ¶ 23-24. Several attempts to cap the well and stop the flow using conventional methods failed, and a new surface-water feature known as "the Borehole" or "Borehole Spring" was created. *Id.* Groundwater continues to flow from the Borehole to this day, and the hydrologic impacts from the drilling were significant and far-reaching—it lowered groundwater levels, decreased spring discharge, and caused at least one spring to dry up completely. *Id.* ¶ 25-26; Exh. 12 (Sorrells Decl.) ¶ 24. Drilling in similar conditions within 2,000 feet of designated critical habitat for threatened and endangered species—as is proposed in Rover's NOI—thus presents a likelihood of significant and irreparable harm to listed species and their habitat. Exh. 11 (Zdon Decl.) ¶ 29;  Exh. 4 (Parmenter Decl.) ¶ 24-25.

Despite these risks, BLM and Rover have failed to take any action that would prevent adverse impacts to the listed species in the Refuge and their habitats. BLM did not conduct—or require the company to conduct—a hydrologic study to better understand the groundwater system, and Rover's NOI contains no information on whether or how Rover intends to avoid, minimize, or mitigate the direct, indirect, or cumulative impacts to listed species and their habitats from its proposed drilling. *See generally* Exh. 9 (NOI). Indeed, BLM and Rover have failed to even acknowledge the potential for such impacts. Consequently, BLM and Rover have failed to "prevent adverse impacts to threatened and endangered species, or their habitat which may be affected" by the proposed drilling, and by extension, failed to prevent UUD. 43 C.F.R. § 3809.420(b)(7).

And, because BLM failed to consult with FWS before approving the Project as required under ESA section 7(a)(2), the proposed operations violate the ESA and thus do not "compl[y] with all pertinent Federal and state laws." 43 C.F.R. § 3809.420(a)(6). The ESA requires consultation wherever a proposed action "may affect" a listed species or its critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). For actions "likely to adversely affect" a species or critical habitat, the ESA requires "formal consultation," which may be completed only after FWS issues a "Biological Opinion" on the proposed action. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

As explained above, the proposed drilling is likely to adversely affect threatened and endangered species and their critical habitat. The threat is particularly acute in this case because most of the affected species live only on the Refuge and nowhere else on Earth, and because the impacted resource—groundwater—is both exceptionally scarce and essential to these species' survival. Exh. 6 (FWS Water Report), at 7; *see also* Exh. 4 (Parmenter Decl.) ¶ 15. The Project certainly meets the "may affect" threshold for ESA consultation. As the Ninth Circuit has explained, "'may affect' is a 'relatively low' threshold for triggering consultation. '*Any possible effect*, whether beneficial, benign, adverse or of an undetermined character,' triggers the requirement." *Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1027 (9th Cir. 2012) (*En Banc*) (emphasis in original, citations omitted) (holding that agency's failure to consult when authorizing mining via an NOI violated the ESA).

Yet BLM failed to consult with FWS prior to authorizing the Project, and did not even inform FWS of this threat to Refuge resources before allowing it to go forward. *See* Exh. 2 (Donnelly Decl.) ¶¶ 35-36. This failure not only violates the procedural requirements of ESA Section 7(a)(2), but also the ESA's substantive mandate to "insure that any action authorized, funded, or carried out" by a federal agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2); *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985). And because BLM's authorization of the Project violates the ESA, BLM has failed to prevent UUD. 43 C.F.R. § 3809.420(a)(6).

Finally, BLM did not require Rover to adopt mitigation measures that would prevent UUD. *See* 65 Fed. Reg. 70052; Exh. 14 (M-37039), reinstated by M-37075 (Exh. 15). BLM policy holds that "[a]n impact that can be mitigated, but is not, is clearly unnecessary," 65 Fed. Reg. 70052, and that failure to prevent a mitigable impact to sensitive species or habitats constitutes UUD. Exh. 14 (M-37039) at 20. Yet Rover did not propose—and BLM did not require—mitigation for any of the adverse impacts from the proposed drilling. As noted, no measures are proposed to avoid, minimize, or mitigate impacts to groundwater or groundwater-dependent species and ecosystems. And Rover's NOI fails to include even the most basic measures that would minimize the Project's other environmental impacts—such as lining sumps to avoid groundwater contamination—and selecting travel routes that do not impact the Ash Meadows and Amargosa Mesquite ACECs. *See* Exh. 9 (NOI). Because BLM and Rover failed to take reasonable measures to mitigate the impacts of the proposed drilling, they have failed to prevent UUD and violated FLPMA. 43 C.F.R. § 3809.420(a)(4); 65 Fed. Reg. 70052; Exh. 14 (M-37039), reinstated by M-37075 (Exh. 15).

**B.   BLM Violated FLPMA and the Mining Regulations Because the Project Does Not Qualify as a "Notice" Operation.**

BLM regulations divide mineral operations into three categories according to the size and location of the operations. 43 C.F.R. § 3809.10. Mineral exploration operations that will result in only negligible disturbance of federal lands, and do not involve the use of mechanized earth-

moving equipment, truck-mounted drilling equipment, or explosives, are identified as "casual" use operations. 43 C.F.R. § 3809.5. "Notice" mineral exploration operations are those that will cause a cumulative surface disturbance of five acres or less, 43 C.F.R. § 3809.21, and do not take place in certain "special status areas" where Section 3809.21 does not apply, including ACECs and "lands or waters known to contain Federally proposed or listed threatened or endangered species or their proposed or designated critical habitat." 43 C.F.R. §§ 3809.11 (c)(3) and (6).

For mining or mineral exploration operations that will cause a cumulative surface disturbance of more than five acres, and for operations proposed in specifically designated "special status areas," the operator must submit a "Plan of Operations," that must be approved by BLM. 43 C.F.R. § 3809.11. Prior to approving the Plan, BLM must prepare an Environmental Assessment or Environmental Impact Statement pursuant to NEPA. 43 C.F.R. § 3809.411; BLM Handbook H-3809-1, § 4.4.1.3.2 (NEPA Analysis); 42 U.S.C. § 4332(C).

Here, the proposed drilling operations do not qualify as "notice" operations under BLM's regulations because they will take place in, and adversely impact, the Ash Meadows and Amargosa Mesquite ACECs. The Project area includes the northern portion of the Amargosa Mesquite ACEC. Further, the NOI states that Rover will access the proposed drilling sites via dirt roads from State Route 373 to the west or Highway 160 to the east. Many of these routes—including the most developed and passable dirt roads—run through either the Ash Meadows ACEC or the Amargosa Mesquite ACEC. An increase in heavy vehicle traffic through either of these areas will adversely impact their conservation purposes through noise, dust, ground disturbance, and other associated impacts, yet BLM failed to take the reasonable precaution of prohibiting activities in these ecologically sensitive areas. Because some of the activities associated with the exploration project will take place in designated ACECs, the Project does not qualify as a "notice" operation and must proceed under a Plan of Operations with full environmental review. 43 C.F.R. §§ 3809.11; 3809.411.

Moreover, the proposed operations cannot be approved under a notice because they will encounter the groundwater aquifer, thus impacting "lands or waters known to contain Federally

proposed or listed threatened or endangered species" as well as "their proposed or designated critical habitat." 43 C.F.R. § 3809.11(c)(6). As BLM has stated in its preamble to the current regulations, rejecting the mining industry's argument to remove § 3809.11(c)(6), "BLM looked carefully at any activity in lands or waters where surface disturbance *could cause an impact to species or habitat*. This scrutiny helps the operator avoid inadvertently violating the Endangered Species Act." 66 Fed. Reg. 54834, 54838 (Oct. 30, 2001)(emphasis added).

BLM has indicated in communications with Plaintiffs that it inspected the immediate area of the proposed drilling pads for threatened and endangered plants, but did not consider the potential for impacts to the groundwater resources and ecosystems that support threatened and endangered species at the Refuge. *See* Exh. 2 (Donnelly Decl.) ¶ 31. BLM thus applied Section 3809.11 in an unreasonably narrow manner—one at odds with the "text, structure, history, and purpose" of the regulation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (internal quotations and citations omitted).

First, BLM's application of Section 3809.11(c)(6) here is contrary to its plain text. Section 3809.11 exempts both "lands" and "waters" known to contain threatened and endangered species from "notice" mining. *See also* 43 C.F.R. § 3809.5 (explaining that "surface disturbance greater than casual use . . . includes sampling, drilling, or developing surface or underground workings"). Thus, by its plain terms, Section 3809.11(c)(6)'s exemption from the "notice" provisions extends beyond the immediate area of surface disturbance on land to encompass "waters" containing protected species that may be adversely impacted by the proposed surface disturbance. BLM ignored the plain meaning of the regulation when it failed to consider the potential impacts of Rover's proposed drilling on the groundwater directly below the proposed drilling sites and the hydrologically connected waters in the Refuge.

Second, BLM's application of Section 3809.11(c)(6) here is inconsistent with the purposes of the "notice" mining provisions—namely, to protect threatened and endangered species on public lands from the impacts of mineral operations, and to avoid violations of the ESA. *See Kisor*, 139 S. Ct. 2415. When BLM promulgated the current mining regulations, it made clear that it

established the thresholds for "notice" operations based on "the level of harm likely to result from the activity, rather than its purpose or intended result." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 52 (D.D.C. 2003) (quoting 66 Fed. Reg. at 54,846 (Oct. 30, 2001)).

Regarding "special status areas" specifically, BLM recognized that "certain lands require a greater degree of protection than others," and explained that under the regulations it would "look[] carefully at any activity in lands or waters where surface disturbance *could cause an impact* to [endangered or threatened] species or habitat." 66 Fed. Reg. at 54,838 (emphasis added). Such scrutiny, accomplished in part through preparation of a Plan of Operations and the appropriate level of NEPA analysis, would "help[] the operator avoid inadvertently violating" the ESA. *Id.* Clearly, BLM failed to "look carefully" at the proposed drilling operations here, and did not require a Plan of Operations, despite the obvious likelihood of adverse impacts to threatened and endangered species.

The "notice" mining provisions and their exemptions must also be read as part of a comprehensive regulatory scheme designed to prevent UUD. *See* 66 Fed. Reg. at 54,846-47 ("BLM's main mechanism for preventing unnecessary or undue degradation is through the review of Notices and the review and approval of Plans of Operations. The threshold for when to file a Plan, what it must contain, and how it is reviewed, are part of this mechanism."). And, per BLM's own performance standards at 43 C.F.R. § 3809.420, preventing UUD includes preventing "adverse impacts" to threatened and endangered species, not simply avoiding direct destruction of occupied terrestrial habitat.

Finally, as a practical matter, BLM's interpretation would essentially nullify Section 3809.11(c)(6)'s protection of protected species and their habitat. Under BLM's position, as long as the disturbance itself did not take place directly in occupied habitat on the ground, the project would escape any meaningful environmental review, regardless of how severely it might harm listed species. Such cursory review for highly impactful projects that harm endangered and threatened species and their habitat does not comport with either the plain text or the purpose of the mining regulations, and must not be permitted here. *See* 66 Fed. Reg. at 54,838.

### C. BLM Violated NEPA and the Mining Regulations Because It Did Not Prepare an Environmental Assessment or Environmental Impact Statement.

Mining operations that do not qualify as "casual use" or "notice" operations are subject to NEPA, which courts have called "our basic national charter for protection of the environment." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020); *see also* 43 C.F.R. § 3809.411; BLM Handbook H-3809-1, § 4.4.1.3.2 (NEPA Analysis). In passing NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment" and set out "to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a).

NEPA and its implementing regulations require federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3. An agency may first prepare an environmental assessment (EA) to determine whether an EIS is necessary. 40 C.F.R. § 1501.5. In considering whether the effects of a proposed action are significant, and thus require an EIS, agencies "should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act." 40 C.F.R. § 1501.3.

Whether the agency prepares an EA or an EIS, the agency must take a "hard look" at all direct, indirect, and cumulative environmental impacts of the proposed action and reasonable alternatives thereto. *Kern v. United States BLM*, 284 F.3d 1062, 1071 (9th Cir. 2002). To fulfill its purpose, the agency's environmental analysis must "provide full and fair discussion of significant environmental impacts and . . . inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

As explained above, the Project does not qualify as a "notice" operation due to its impacts on designated ACECs and habitat for threatened and endangered species. Projects that do not qualify as "causal use" or "notice" operations require NEPA analysis. 43 C.F.R. § 3809.411; BLM

Handbook H-3809-1, § 4.4.1.3.2 (NEPA Analysis); 42 U.S.C. § 4332(C). BLM indisputably did not prepare an EA or EIS to study the Project's impacts and inform the affected public before allowing the Project to go forward. Because the Project does not qualify as "casual use" or a "notice" operation, and because BLM did not prepare an EA or EIS before approving, authorizing, and allowing the Project, BLM violated its own regulations and NEPA. *See id.*

## II. <u>Injunctive Relief is Needed to Prevent Irreparable Harm.</u>

This Court should issue immediate relief to prevent imminent and irreparable harm to Plaintiffs and the environment. *Winter*, 555 U.S. at 20. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

The proposed drilling operations will harm Plaintiffs' "members' ability to view, experience, and utilize the areas in their undisturbed state," and thereby inflict an "actual and irreparable injury." *All. for the Wild Rockies*, 632 F.3d 1127, 1135 (9th Cir. 2011) (cleaned up); *see also* Exh. 2 (Donnelly Decl.) ¶¶ 22-24, 38; Exh. 13 (Voehl Decl.) ¶¶ 23-25, 30; Exh. 12 (Sorrells Decl.) ¶¶ 25-28, 31. As detailed in the declaration of Andy Zdon, there is a "virtual certainty" that the proposed exploratory drilling will encounter artesian conditions in the groundwater aquifer, and without any plan to control or mitigate artesian flows, it is likely that the proposed drilling will cause irreparable injury to the springs within the Refuge and the endemic wildlife and plant species that depend on them. Exh. 11 (Zdon Decl.) ¶¶ 15-29. All of the past drilling in the Project area and near the Refuge has encountered artesian conditions, *id.* ¶¶ 16-21, and artesian flow from mineral exploration boreholes has been shown to have significant and far reaching effects in the affected hydrologic system, up to and including causing springs to dry up entirely, *id.* ¶¶ 22-25. Moreover, BLM's failure to study these potentially catastrophic adverse effects or develop appropriate mitigation measures before allowing operations to proceed increases the risk of irreparable harm to public resources and Plaintiffs' members' interests. *See S. Fork*

*Band Council of W. Shoshone v. United States DOI*, 588 F.3d 718, 728 (9th Cir. 2009) (noting, in the context of proposed mining development on federal public lands, that "[t]he likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high"); *see also* Exh. 11 (Zdon Decl.) ¶¶ 22; Exh. 2 (Donnelly Decl.) ¶¶ 22-24, 38; Exh. 13 (Voehl Decl.) ¶¶ 23-25, 30; Exh. 12 (Sorrells Decl.) ¶¶ 25-28, 31.

The Project also involves the removal of desert vegetation, overland travel with heavy equipment, and the installation of drilling rigs, all of which constitute irreparable environmental harm warranting injunctive relief. *See Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir 2020) (logging of trees for 200 feet on either side of roads running through burned forest area constituted irreparable harm); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) ("[O]nce the desert is disturbed, it can never be restored."); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 & n.4 (9th Cir. 2004) (recognizing irreparable injury from harm to vegetation in "environmentally sensitive areas"); *see also* Exh. 2 (Donnelly Decl.) ¶ 38; Exh. 13 (Voehl Decl.) ¶¶ 25, 30; Exh. 12 (Sorrells Decl.) ¶¶ 28, 31.

The threat of irreparable harm to the environment and Plaintiffs' interests is compounded in this case by the prospect of significant injury to ESA-listed species, including the Ash Meadows Amargosa pupfish. "Harm to endangered or threatened species is considered irreparable harm, and the balance of hardships will generally tip in favor of the species." *Ctr. for Biological Diversity v. Jewell*, No. CV-15-00019-TUC-JGZ, 2018 WL 1586651, at *22 (D. Ariz. 2018) (citing cases). Here, hydrologic impacts induced by the proposed drilling stand to irreparably harm at least three species of endangered fish and several species of threatened and endangered plants. *See* Exh. 4 (Parmenter Decl.) ¶¶ 12-13, 23-25. Because these species depend on "reliable spring discharge and shallow groundwater for their survival[,] . . . [a]ny substantial reduction of this discharge will cause irreparable harm, up to and including [their] potential extinction. *Id.* ¶ 25. The Court must issue preliminary injunctive relief to prevent such irreparable harm to listed species and their habitat, as neither BLM nor Rover has a plan in place to do so.

### III.  The Balance of Equities Favors an Injunction.

While the injuries that the Project threatens to inflict on the environment and Plaintiffs' interests are irreversible or at least of many years' duration, any hardship to BLM or Rover would consist principally of temporary economic losses and delay. Such impacts do not override harms to the environment and imperiled species in the equitable balancing analysis. *S. Fork Band Council of W. Shoshone of Nev*, 588 F.3d at 728 (balance of hardships favored plaintiff in challenge to mining project because principal hardship to project developer was "economic" and "may for the most part be temporary"); *Kootenai Tribe v. Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002) ("[R]estrictions on human intervention are not usually irreparable in the sense required for injunctive relief" because they can be removed if later proved to be more harmful than helpful). In the face of irreparable harm to the environment, courts will withhold or limit injunctive relief only in "unusual circumstances." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 n.18 (9th Cir. 2001) (citation omitted); *see also League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (holding that if irreparable environmental harm is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment.") (quoting *Amoco*, 480 U.S. at 545).

### IV.  The Public Interest Favors an Injunction.

The public interest favors injunctive relief. The Ninth Circuit recognizes "the public interest in careful consideration of environmental impacts before major federal projects go forward, and . . . [has] held that suspending such projects until that consideration occurs 'comports with the public interest.'" *All. for the Wild Rockies*, 632 F.3d at 1138 (citation omitted). Congress has recognized through the enactment of NEPA that there is a strong public interest in requiring agencies to fully consider the environmental consequences of their decisions. There is also an undeniable "public interest in preserving nature and avoiding irreparable environmental injury," *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (*en banc*), and "in careful consideration of environmental impacts before major federal projects go forward," *Alliance for the Wild Rockies*, 632 F.3d at 1138. Finally, the public has an overarching interest in its government

abiding by the laws and regulations governing it. *See, e.g., East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018); *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011).

## V. <u>No Bond Should be Required</u>.

Plaintiffs are non-profit conservation groups and seeking to advance the public interest in this litigation. Therefore, the Court should waive the bond requirement, or impose a nominal bond under the public interest exception to Fed. R. Civ. P. 65(c). Requiring security under Fed. R. Civ. P. 65(c) is discretionary, and "special precautions to ensure access to the courts must be taken where Congress has provided for private enforcement of a statute." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985). Courts routinely impose either no bond or a minimal bond in public interest environmental cases. *See, e.g., City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1148 (C.D. Cal. 1999); *Friends of Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975). Exercise of the Court's discretion to waive the bond is warranted here because Plaintiffs seek to enforce public rights under NEPA and other statutes, and a substantial bond requirement would have a chilling effect on future efforts to vindicate public interests. *See* Exh. 2 (Donnelly Decl.) ¶¶ 40-48; Exh. 13 (Voehl Decl.) ¶¶ 32-39.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiffs respectfully request that this Court enjoin any implementation of BLM's decision and actions approving Rover's NOI and the proposed drilling operations pending resolution of the merits of this action.

Dated July 17, 2023                        Respectfully submitted,

                                           */s/ Scott Lake*
                                           _____
                                           Scott Lake
                                           Center for Biological Diversity
                                           P.O. Box 6205
                                           Reno, NV 89513
                                           (802) 299-7495
                                           slake@biologicaldiversity.org


                                           */s/ Roger Flynn*
                                           _____
                                           Roger Flynn
                                           Western Mining Action Project
                                           P.O. Box 349, 440 Main Street, #2
                                           Lyons, CO 80540
                                           (303) 823-5738
                                           roger@wmaplaw.org
                                           (*pro hac vice application pending*)

                                           *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Scott Lake, certify that I served the foregoing and all exhibits to all parties via this Court's ECF filing system, this 17th day of July, 2023.

*/s/ Scott Lake*